## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT J. ARMOUR,
  c/o National Student Legal Defense
Network
1015 15th St NW
Washington, D.C. 20005

                              *Plaintiff*,

          v.

ELISABETH DEVOS, *in her official*
*capacity as Secretary of Education*,
  400 Maryland Avenue S.W.
  Washington, D.C. 20202

and

UNITED STATES DEPARTMENT OF
EDUCATION,
  400 Maryland Avenue S.W.
  Washington, D.C. 20202

                              *Defendants*.

Case No. 19-cv-2556

**COMPLAINT**

### INTRODUCTION

1.      Plaintiff Robert J. Armour owes over $100,000 in federally issued student loans

borrowed to finance approximately six years of attendance at a doctoral psychology program at

Argosy University-Schaumburg ("Argosy Schaumburg").  Mr. Armour was unable to complete

his program of study at Argosy Schaumburg because the school abruptly closed in December

2018, while he was on an approved leave of absence due to his treatment for stage IV colon

cancer.

2.     Fortunately for Mr. Armour, the Higher Education Act ("HEA") provides a remedy for precisely this circumstance: when a school abruptly closes, students in attendance, recently withdrawn, or on an approved leave of absence have a statutory and regulatory right to receive a discharge of any federal Direct Loans.  Known as a "closed school discharge," this right erases all federal student loan debt incurred to attend the closed school and provides a refund of any amount already paid on the debt.

3.     Closed school discharge is non-discretionary; when a student satisfies the law's requirements, the Secretary must grant relief.  As relevant here, students attending the school within 120 days of closure, *or who are on an approved leave of absence*, are entitled to a closed school discharge so long as they do not transfer credit earned at the closed institution to a similar program at a different institution.  Mr. Armour made no such credit transfer.

4.     On March 21, 2019, Mr. Armour submitted the paperwork necessary to receive his closed school discharge.  His application contained a declaration as well as evidence describing his medical condition and establishing that he was on an approved leave of absence within 120 days of Argosy Schaumburg's December 14, 2018 closure.

5.     On or about April 10, 2019, Mr. Armour received a letter from both the servicer of his federal student loans, FedLoan Servicing ("FedLoan"), and the U.S. Department of Education ("Department"), informing him that his application "is materially complete and that [he] appear[s] to meet the criteria for discharge of [his] loan."  The letter also stated that it was "not a final determination of [his] eligibility for loan discharge" and that Department's Office of Federal Student Aid ("FSA") is "responsible for making a final determination of [his] eligibility for discharge."

6.      On or about May 9, 2019, Mr. Armour was informed that FSA had "concluded that [he did] not meet the eligibility criteria for this discharge."  The sole justification provided for this reversal was the following statement: "You withdrew from Argosy University-Schaumburg more than 120 days before the official school closure date, as established by the U.S. Department of Education."  The Department was incorrect.  Mr. Armour never withdrew from school.

7.      Mr. Armour alleges that the Department's denial of his closed school discharge was arbitrary and capricious in violation of the Administrative Procedure Act ("APA") because it was contrary to the evidence attached to his application.  The Department's decision did not address the evidence attached to Mr. Armour's application and did not cite to any evidence in support of its conclusion that Mr. Armour withdrew more than 120 days before the school closed.

8.      In addition, the Department has violated Mr. Armour's rights under the Due Process Clause of the Fifth Amendment to the United States Constitution by failing to provide adequate notice of the reasons for its May 9 decision and by failing to provide Mr. Armour with an opportunity to administratively challenge the decision on the basis that it was made in error.

9.      In July of 2019, Mr. Armour's cancer returned.  He is once again on chemotherapy.  And he still owes over $100,000 in student loans for a school that closed its doors while he was on a leave of absence fighting for his life.

## PARTIES

10.     Plaintiff Robert J. Armour is a former doctoral psychology student of the now-closed Argosy University in Schaumburg, Illinois.  Mr. Armour currently resides in Polo, Illinois.

11.     Defendant the United States Department of Education is an agency of the United States, within the meaning of the APA, 5 U.S.C. § 701(b)(1).  It is responsible for overseeing and implementing rules for the federal student aid program.  Its principal office is located at 400 Maryland Avenue S.W., Washington, D.C. 20202.

12.     Defendant Elisabeth DeVos is the Secretary of Education and is charged by statute with the supervision and management of all decisions and actions of the United States Department of Education. Plaintiff sues Secretary DeVos in her official capacity.

13.     Secretary DeVos maintains an office at the Department's headquarters, located at 400 Maryland Avenue S.W., Washington, D.C. 20202.

## JURISDICTION & VENUE

14.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the APA, 5 U.S.C. §§ 701-706, and the Due Process Clause of the Fifth Amendment.

15.     The relief sought by Mr. Armour is authorized by the APA, 5 U.S.C. § 702, and the Court's authority to enjoin federal officers from violating the U.S. Constitution and federal law.

16.     Congress has waived sovereign immunity as to the relief requested pursuant to 5 U.S.C. § 702, and sovereign immunity does not bar Mr. Armour from securing relief for the Due Process violations he alleges.  Defendants' actions constitute final agency actions, and no further exhaustion of remedies is required or available.

17.     Mr. Armour has no adequate remedy at law because he cannot sue the Secretary or the Department (collectively, the "Department") for money damages.

18.     Because this is an action against an officer and agency of the United States, venue is proper in this district pursuant to 28 U.S.C. § 1391(e).  Venue is also proper in this district because Secretary DeVos performs her official duties here.  Finally, many of the events giving rise to this action took place here.

## FACTUAL ALLEGATIONS

### *The Closed School Discharge Regulation*

19.     The HEA and its implementing regulations require the Secretary to discharge a federal student loan if a borrower is unable to complete his or her program due to a school's closure.  20 U.S.C. § 1087(c)(1); 34 CFR § 685.214 (a).

20.     The Department's regulations provide that a closed school discharge must be granted if a borrower is enrolled at the school at the time it closed or withdrew not more than 120 days prior to the school's closure.  34 C.F.R. § 685.214(c)(1)(i)(B).

21.     The statutory and regulatory framework do not provide the Secretary any discretion—when a borrower satisfies the requirements of the HEA, the closed school discharge must be provided.

22.     Accordingly, where applicants are able to make out the requirements for a closed school discharge, they are entitled to the benefits as a matter of law.  The HEA therefore creates a property interest in closed school discharge, and applicants must be afforded procedural protections under the Due Process Clause to demonstrate their eligibility.

23.     A student on an approved leave of absence is treated as if he is still enrolled.  *See* Loan Discharge Application: School Closure, OMB No. 1845-0058.  Accordingly, the Department must grant a closed school discharge application if the applicant is on an approved leave of absence when the school closed or within 120 days of closure.

24.     The definition of an approved leave of absence is found at 34 C.F.R. § 668.22(d).

Among other things, it requires the institution to have a formal policy, the student to have

followed the policy, the institution to determine that there is a reasonable expectation that the

student will return, and the institution to approve the student's request in accordance with its

policy.

25.     When a borrower receives a closed school discharge, the borrower is no longer

obligated to repay the loan or any of its associated charges or costs.  34 C.F.R. § 685.214(b)(1).

That includes the loan principal, accrued interest, and collection costs, among others.

26.     In addition, the borrower is reimbursed for all amounts paid on the loan, whether

those payments were made voluntarily or involuntarily, such as through tax refund offset or

wage garnishment.  *Id.* § 685.214(b)(2).

27.     The Department's regulations also require that closed school discharges be

reported to all credit reporting agencies "so as to delete all adverse credit history assigned to the

loan." *Id.* §685.214(b)(4).

28.      If the Secretary determines that a borrower who requests a discharge does not

meet the qualifications for a discharge, "the Secretary notifies that borrower in writing of that

determination and the reasons for the determination."  *Id.* §685.214(f)(7).

29.     The Department does not have a post-deprivation process by which a Direct Loan

borrower can appeal or otherwise challenge an erroneous denial of a closed school discharge

application.

### *Mr. Armour's Background*

30.     Prior to his enrollment at Argosy Schaumburg, Mr. Armour worked for 25 years

for the Illinois Department of Corrections.  For 15 years he worked as an officer and for ten

years he worked as a lieutenant supervising the maximum security psychiatric unit at the Dixon Correctional Center.

31.     For the final 12 years of his employment, Mr. Armour worked full time while attending college at night to obtain his associate's degree in criminal justice, bachelor's degree in behavioral science, and master's degree in psychology, all of which he paid for without taking out federal student loans.

32.     In 2010, Mr. Armour decided that he wanted to obtain his Psy. D. in psychology in order to work for the Department of Corrections as a staff psychologist.

33.      After researching his options, he determined that Argosy Schaumburg was the closest school that offered the program he was interested in.  The campus was an approximately two hour drive from his house.

34.     In the Fall of 2010, Mr. Armour took out federal student loans to enroll in Argosy Schaumburg's doctoral program in psychology.

### *Argosy Schaumburg is Purchased and Subsequently Closed by the Dream Center*

35.     At the time of his enrollment, Argosy Schaumburg was part of a large chain of for-profit colleges then owned by the Education Management Corporation ("EDMC") under the brand names Argosy University, the Art Institute, and South University.

36.     In October 2017, the Dream Center, a Pentecostal Christian organization based in Los Angeles, California, purchased Argosy University, South University, and Art Institute campuses from EDMC.  Collectively, the Dream Center purchased over 50 campuses in more than 30 cities, with over 44,000 students.  At the time of purchase, the Dream Center had no experience operating institutions of higher education.

37.     It did not take long for Dream Center's foray into the higher education market to fail.  *See, e.g.,* Stacy Cowley and Erica L. Green, "A College Chain Crumbles, and Millions in Student Loan Cash Disappears," N.Y. Times (Mar. 7, 2019), *available at:* https://www.nytimes.com/2019/03/07/business/argosy-college-art-insititutes-south-university.html; Michael Vasquez, "The Nightmarish End of the Dream Center's Higher-Ed Empire," Chronicle of Higher Education (March 9, 2019), *available at:* https://www.chronicle.com/article/The-Nightmarish-End-of-the/245855; Letter from 84 Members of Congress to Secretary Betsy DeVos re: Dream Center (Mar. 13, 2019).

38.     By July 2018, less than one year after the purchase, Dream Center executives announced that they would be closing 30 campuses, including Argosy Schaumburg.  The Schaumburg campus closed on December 14, 2018.

39.     On February 27, 2019, the Department terminated the remaining Argosy campuses' participation in the federal student financial aid program finding, among other things, that Argosy was in "severe breach of the required fiduciary standard of conduct" and that it had demonstrated a "blatant disregard of the needs of its students."

***Mr. Armour's Cancer Diagnosis and Leave of Absence from Argosy Schaumburg***

40.     Mr. Armour was enrolled as a full-time student at Argosy Schaumburg when, in April of 2018, his oncologist discovered a recurrence of his colon cancer.  Originally diagnosed as stage III colon cancer, Mr. Armour's cancer had metastasized to his liver and advanced to stage IV.

41.     The stage IV diagnosis required Mr. Armour to seek a leave of absence in order to immediately begin chemotherapy.  Mr. Armour planned to return to Argosy Schaumburg to

continue his studies as soon as his medical treatment was completed and he was healthy enough

to do so.  Mr. Armour had no intention of withdrawing, and did not withdraw, from school.

42.     On May 16, 2018, in response to Mr. Armour's request for a leave of absence,

Tyler Shippen from Argosy Schaumburg's registrar's office emailed Mr. Armour explaining that

his "request to take a Temporary Withdrawal for the Summer 2018 semester has been approved.

The effective date of your withdrawal is 05/07/18, and ends on 08/22/18.  You are expected back

for the Fall 2018 term, beginning 09/06/18."  A true and correct copy of this email was attached

to Mr. Armour's closed school discharge application.

43.     On or about July 2, 2018, Dream Center executives sent a memo to employees

explaining that due to declining enrollment, the company would be closing 30 of its campuses,

including Argosy Schaumburg.

44.     While on leave, Mr. Armour was unaware that his school would be closing.

45.     On August 17, 2018, as his leave was coming to an end, Mr. Armour reached out

to Laura Zuniga, his Argosy Schaumburg academic advisor, to register for courses for the Fall

2018 term.  Ms. Zuniga responded that "[w]e can get you reentered and registered." She did not

inform Mr. Armour that Argosy Schaumburg was closing.

46.     Shortly thereafter, Mr. Armour's oncologist informed him that he qualified for a

potentially life-saving liver surgery that could remove his tumors.  On August 29, Mr. Armour

emailed Ms. Zuniga to explain that he would need to extend his leave in order to have the

surgery.

47.     Mr. Armour's request to extend his leave was approved by Ms. Zuniga.  Again, he

was not informed that his school was scheduled to close.

48.     On November 9, 2018, Ms. Zuniga emailed Mr. Armour: "I said I would check in when Spring registration was under way.  How are you feeling?  I hope that surgery went well, and that it was all you expected.  Let me know if there is anything I can do for you (praying for good, positive vibes for your recovery)[.]"  Again, Ms. Zuniga did not inform Mr. Armour that his school was scheduled to close.

49.     On December 14, 2018, the date Argosy Schaumburg closed, Mr. Armour emailed Ms. Zuniga to inform her that he was "waiting to start post op Chemo" and to ask if he needed to "fill out additional *medical leave paperwork* at this time." (emphasis added)  Later that day, Ms. Zuniga responded: "I think we are fine.  Do you anticipate a summer return?"

50.     When Argosy Schaumburg closed, Mr. Armour thought about trying to transfer his credits as he continued his recovery, but the schools that he could transfer to were located in Chicago, which was even further away from his home.  Mr. Armour ultimately decided that, given the circumstances, his best option was to seek a closed school discharge as permitted under the law.

51.     Prior to applying for the discharge, Mr. Armour attempted for months to obtain his complete leave-of-absence records from Argosy, but was only able to obtain email communications.  He contacted multiple Argosy employees by phone and email, but none were able to locate his complete records.

### *Mr. Armour Was on an Approved Leave of Absence Within 120 Days of Argosy Schaumburg's Closure*

52.     Argosy Schaumburg called its formal leave of absence policy a "temporary withdrawal."

53.     Argosy course catalogs make clear that the university considered its "temporary withdrawal" to be the same thing as a leave of absence.  According to one course catalog from 2018:

> For a student who has taken a *temporary withdrawal (i.e., leave of absence)* from Argosy University, the length of time withdrawn from the program is not counted in the calculation of his or her time to program completion. A student cannot be temporarily withdrawn from the University for an accumulated period of more than one year. Please note that temporary withdrawal from the program must be formally approved by the program faculty and administration. (emphasis added)

54.     Argosy Schaumburg had no other leave policies – a "temporary withdrawal" was the only way for Mr. Armour to take leave in order to receive lifesaving cancer treatment.

55.     Like a leave of absence, Argosy's "temporary withdrawal" did not require Mr. Armour to reenroll.  Pursuant to the policy, Mr. Armour's leave ended on August 22, 2018, and he was "expected back" by September 6, 2018.  Mr. Armour did not need to reapply or seek permission to return.

56.     There is no such thing as a "temporary withdrawal" under federal law.

57.     Mr. Armour's leave status was equivalent to an approved leave of absence as defined by 34 C.F.R. § 668.22(d).  Argosy Schaumburg had a formal policy, the policy did not involve additional charges by the institution, Mr. Armour followed the policy in requesting his leave, Argosy Schaumburg determined that there was a reasonable expectation that Mr. Armour would return, and it approved his request for leave in accordance with its policy.

58.     Mr. Armour was therefore on a leave of absence, as that term is defined by federal law, within 120 days of Argosy Schaumburg's closure.

### ***Mr. Armour's Closed School Discharge Application & Denial***

59.     On March 21, 2019, Mr. Armour submitted a closed school discharge application to his servicer, FedLoan.  FedLoan is a servicer of student loans that acts pursuant to a contract with the Department.

60.     Mr. Armour's application contained a detailed declaration describing his leave of absence status and attaching documentation of his medical condition as well as relevant email correspondence with Argosy Schaumburg regarding his leave of absence and expected return date.

61.     Mr. Armour explained in the declaration attached to his closed school discharge application:

> The first phase of my leave of absence ran from May 7, 2018 until August 22, 2018, with classes were [sic] to resume on September 6, 2018.  A true and correct copy of email correspondence with Argosy Schaumburg confirming my official leave of absence is attached hereto as <u>Exhibit 2</u>.  This alone is sufficient to establish my closed school eligibility because it is within the required 120 day closed school discharge window.

62.     On or about April 10, 2019, Mr. Armour received a letter responding to his closed school discharge application.  This letter, on letterhead indicating it was from both FedLoan and the Department, informed Mr. Armour that "[w]e have reviewed your application for discharge of your Federal Student Loans based on School Closure.  We have concluded that it is materially complete and that you appear to meet the criteria for discharge of your loans."

63.     The April 10 letter also informed Mr. Armour that his request had been forwarded to FSA for "final review."  The letter stated that it was "not a final determination of your eligibility for loan discharge" and that "FSA is responsible for making a final determination of your eligibility for discharge."  The letter also informed Mr. Armour that he would be notified "of the outcome of FSA's review."

64.     The April 10 letter did not ask Mr. Armour to submit any additional information or documentation to support his "materially complete" application.

65.     On or about May 9, 2019, Mr. Armour received a second communication from FedLoan and the Department.  In the May 9 communication, Mr. Armour was informed that FSA "has completed the review of your request for a discharge of your Federal Student Loans due to School Closure.  Based on their review, FSA has concluded that you do not meet the eligibility criteria for this discharge for the following reasons: You withdrew from Argosy University-Schaumburg more than 120 days before the official school closure date, as established by the U.S. Department of Education."

66.     The May 9 denial letter further explained that the Department would only reconsider Mr. Armour's claim if he could "provide additional evidence or information that you believe will entitle you to have your loan discharged."

67.     The Department's decision is counter to—and does not describe, analyze, or even mention—the evidence attached to Mr. Armour's application establishing that he was on a leave of absence within 120 days of Argosy Schaumburg's closure.

68.     The Department's decision also does not explain why it reversed the earlier April 10 decision and does not describe, analyze, or even mention the evidence the Department relied upon to determine that Mr. Armour withdrew more than 120 days prior to Argosy Schaumburg's closure.  Mr. Armour, therefore, had no knowledge of what evidence the Department considered or relied upon in denying his application.

69.     On June 6, 2019, Mr. Armour submitted a FOIA request (No. 19-00158-PA) seeking "all documents the U.S. Department of Education relied upon in its May 9, 2019

decision to deny my school closure discharge application number 84682611 as well as related communications."

70.     On August 7, 2019, the Department provided a final response to Mr. Armour's request containing 31 pages of documents.  A true and correct copy of the Department's cover letter and production is attached hereto as <u>Exhibit 1</u>.  These documents include: (i) Mr. Armour's original closed school discharge application and attachments; (ii) the April 10 approval and May 9 denial letters; (iii) loan details derived from the National Student Loan Database System; and (iv) a single page screen shot of a "Def/Forb Max End Date Calculator" revealing that the Department calculated 120 days from August 22, 2018 (the date Mr. Armour's initial period of leave ended) to be December 19, 2018 (i.e. within 120 days of Argosy Schaumburg's December 14 closure date).

71.     By the Department's own calculation, therefore, Mr. Armour satisfied the 120 day statutory deadline.

72.     The Department's records do not include any documents from or communications with Argosy Schaumburg, the Dream Center, or any other school officials.

73.     The Department's records also do not include any discussion, analysis, or mention of a leave of absence or temporary withdrawal.

74.     The Department concluded that Mr. Armour's application was "materially complete" and did not seek any additional information from him.

75.     Contrary to the Department's May 9 determination, Mr. Armour never withdrew from Argosy Schaumburg.

76.     Over the course of two decades, Mr. Armour made tremendous sacrifices in order to advance his education.  For twelve years, he worked full time while attending night school to

earn his associate's degree in criminal justice, bachelor's degree in behavioral science, and master's degree in psychology.  For nearly six years, he commuted two hours each way to attend Argosy Schaumburg to earn his doctoral degree.  For over one year, he remained enrolled at Argosy while battling stage III colon cancer.  Mr. Armour did not quit when he was so close to the finish line.

## CAUSES OF ACTION

## COUNT I – ARBITRARY, CAPRICIOUS, AND UNLAWFUL AGENCY ACTION UNDER 5 U.S.C. § 706(2)

77.     Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

78.     Under section 706(2) of the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).  A court shall also set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" *Id.* § 706(2)(C).

79.     The HEA requires the Secretary to discharge a federal student loan if the borrower was unable to complete the educational program due to the school's closure. 20 U.S.C. § 1087(c)(1).

80.     The Department's regulations provide that a closed school discharge must be granted if a borrower was attending the school when it closed or withdrew not more than 120 days prior to the school's closure.  34 C.F.R. § 685.214(c)(1)(i)(B).  A student on an approved leave of absence is treated as if he is still enrolled.  *See* Loan Discharge Application: School Closure, OMB No. 1845-0058.

81.     The Department's May 9, 2019 decision to deny Mr. Armour's closed school discharge application constituted a final agency action, and no further exhaustion is necessary or available.

82.     The Department's determination that Mr. Armour "withdrew from Argosy University-Schaumburg more than 120 days before the official school closure date" is arbitrary and capricious in that it is contrary to the evidence before it establishing that Mr. Armour was on an approved leave of absence through at least August 22, 2018, which is within 120 days of Argosy Schaumburg's December 14, 2018 closure date.

83.     The Department's denial must be set aside under the APA, 5 U.S.C. § 706(2), because it is arbitrary, capricious, and otherwise not in accordance with the law, and/or without observance of procedure required by law.

84.     Accordingly, Mr. Armour requests an order vacating the Department's denial of his closed school discharge application and remanding to the Department with direction to approve his application or, in the alternative, an order retaining jurisdiction and remanding to the Department for further action consistent with the APA.

## COUNT II – VIOLATION OF DUE PROCESS UNDER U.S. CONST., AMEND. V & APA § 706(2)

85.     Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

86.     The Fifth Amendment provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law."  Due process requires that, at a minimum, individuals receive notice of the reasons for an agency's deprivation of a property interest and an opportunity to be heard in response.

87.     The APA further provides that a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

88.     Mr. Armour has a constitutionally protected property interest in the government benefit to which he is legitimately entitled, namely, a closed school discharge.

89.     The HEA and its implementing regulations require the Secretary to discharge a federal student loan if a borrower is unable to complete his or her program due to a school's closure.  20 U.S.C. § 1087(c)(1) ("[T]he Secretary shall discharge. . ."); 34 CFR § 685.214 (a) ("The Secretary Discharges. . .").  Thus, the HEA and its implementing regulations create a cognizable property interest for closed school discharge applicants.

90.     Mr. Armour was deprived of a property interest when the Department erroneously denied his closed school discharge application.

91.     The Due Process Clause requires the Department to implement a process that provides applicants for closed school discharge adequate notice of the reasons for the agency's determination as well as an opportunity to be heard in response.  Mr. Armour received neither.

92.     In violation of his due process rights, the Department did not respond to Mr. Armour's arguments, explain how it calculated his leave of absence, describe what evidence it relied upon, or provide him with any other information sufficient to allow him to understand the reasons for its determination that he withdrew more than 120 days before December 14, 2018.

93.     In further violation of his due process rights, the Department did not provide Mr. Armour the opportunity to challenge the May 9 denial on the basis that it was made in error.  The closed school discharge regulation does not provide a process for Direct Loan borrowers to appeal or otherwise challenge an erroneous closed school discharge decision and the May 9

denial letter only allowed Mr. Armour to seek additional review on the basis of "additional evidence or information." There was therefore no process by which Mr. Armour could contest, challenge, or appeal the Department's determination, or request that the Department review and correct its errors, based on the existing record.

94.     Adequate notice and an opportunity to be heard are necessary procedures in light of the important private interest at stake. Closed school discharge relief is critical to borrowers who have just experienced a school closure. For these borrowers, such as Mr. Armour, an erroneous denial means a lifetime of substantial debt with no degree to show for it.

95.     After denial of a closed school discharge application, the borrower's student loan obligation will remain (or return to) collection status and the loan amount will continue to collect interest, which could significantly increase the monetary obligation on the loan. The borrower will also be faced with the full extent of the collections process, including the receipt of collection letters and telephone calls demanding payment.

96.     Further, as part of its management of the federal student loan program, the Department possesses extensive extrajudicial collection powers, including the power to seize federal student borrowers' tax refunds or other federal benefits and garnish their wages without a court order. *See* 31 U.S.C. §§ 3716, 3720A, 3720D. The Department, or one of its agents, can also file suit to obtain judgment against the borrower and, along with that judgment, attach his or her automobiles, home or any other property not specifically exempt from garnishment and attachment.

97.     The results of an erroneous denial can therefore be catastrophic, in many cases increasing the probability of bankruptcy, decreasing the probability of marriage and

homeownership, and substantially harming credit, which can make it harder to obtain employment, rent an apartment, or open a checking account.

98.     The risk of erroneously denied closed school discharge applications through the Department's current procedures is also high.

99.     While specific closed school discharge error rates are not publicly available, data recently provided to Congress indicates that borrowers are experiencing high rates of denial on closed school discharge claims.  Nearly 60 percent of borrowers who submitted a closed school discharge application on or after January 20, 2017 have been denied, representing more than 35,000 borrowers.  *See* Responses by U.S. Department of Education to Senator Patty Murray, Ranking Member, Senate Appropriations Subcommittee on Labor, Health and Human Services, Education, and Related Agencies, Questions For the Record Regarding March 28, 2019 Committee Hearing on FY2020 Dep of Education Budget at 77, *available at:* https://www.help.senate.gov/imo/media/doc/SenMurrayQFRresponses32819LHHShearing.pdf; *see also* Letter from 30 Senators to Sec. DeVos (August 5, 2019) (expressing concern that the vast majority of eligible borrowers from Dream Center and other recently closed schools are not receiving closed school discharges).

100.     Some of these borrowers are being erroneously denied.  During a June 19, 2019 hearing on school closures before the U.S. House Committee on Veterans' Affairs, Economic Opportunity Subcommittee, Nevada Congresswoman Susie Lee expressed concern that the Department was erroneously denying closed school discharge applications.  As she entered two letters into the record from borrowers who were erroneously denied relief, Congresswoman Lee explained: "It's just hard to overstate the personal risks and stakes here. Being told that they

don't qualify for full discharge when in fact they do is the difference between a lifetime of financial ruin or a lifetime of freedom."

101.    Addressing FSA's Deputy Chief Operating Officer for Partner Participation and Oversight, Congresswoman Lee explained that the Department's website provided "misinformation on the date of closure" for the Art Institute of Phoenix campus owned by the Dream Center, which was causing erroneous denials.  Congresswoman Lee further explained that "this is not the only school for which the Department has misinformed students" and that "advocates have repeatedly called the Department and opened cases with the FSA Ombudsman, but this problem [of erroneous closed school discharge denials] persists under your watch."

102.    Recent reporting further suggests that the Department has erroneously denied multiple closed school discharge applications submitted by Dream Center students.  *See, e.g.,* Rachel Leingang, "Art Institute's former students were supposed to have their debt erased. It's not happening." Arizona Republic (June 21, 2019), *available at*:

https://www.azcentral.com/story/news/local/arizona-education/2019/06/19/phoenix-art-institutes-former-students-hit-roadblock-erasing-loans/1494167001/.

103.    Mr. Armour is also not the first to raise concerns about errors in the closed school discharge process for students on leaves of absence.  On December 13, 2017, the North Carolina Attorney General wrote a letter to Secretary DeVos titled: "Charlotte School of Law – Improper Denial of Students on Leaves of Absence for Closed School Discharge."  The letter, which attached evidentiary support, explained that "students who were on approved leaves of absence when [the Charlotte School of Law] closed have been improperly denied closed school discharge" and that "this error gives us serious concern about the accuracy of the closed school

discharge process." *See* Ltr. from Matt Liles, Assistant Attorney General, North Carolina, to Sec. DeVos (Dec. 13, 2007), *available at:* http://www.abajournal.com/files/Liles_to_DeVos.pdf.

104.    Borrowers are at risk of erroneous deprivation absent additional procedural safeguards.

105.    Although the Department's May 9 denial letter is in direct conflict with the evidence provided by Mr. Armour, the Department did not contact Mr. Armour for clarification and there is no evidence in the record that the Department contacted the school or reviewed records from the school.

106.    Providing additional procedural safeguards—such as a right to appeal or otherwise challenge an erroneous decision even when there is no new evidence, or a requirement that the Department conduct some investigation when its records are in conflict with information provided by borrowers—would place only limited additional burden on the Department relative to the importance of providing borrowers with the life-changing statutory entitlement of a closed school discharge.

107.    To remedy these Due Process violations, Mr. Armour requests an order: (i) declaring that the Department's denial of his closed school discharge application violated his right to due process; (ii) declaring that the Department's closed school discharge procedures deprived him of his right to due process; (iii) vacating the Department's denial of his closed school discharge application; and (iv) remanding to the Department with direction to approve his application or, in the alternative, an order retaining jurisdiction and remanding to the Department for further action consistent with the APA and the Due Process Clause of the Fifth Amendment.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief as follows:

*First*, a declaration that the Department's denial of Mr. Armour's closed school discharge application violates the APA and Due Process Clause.

*Second*, a declaration that the Department's closed school discharge application process deprived Mr. Armour of his constitutional right to due process.

*Third*, an order vacating the Department's denial of Mr. Armour's closed school discharge application.

*Fourth*, an order remanding to the Department with direction to approve Mr. Armour's closed school discharge application or, in the alternative, an order retaining jurisdiction and remanding to the Department for further action, consistent with the APA and Due Process Clause.

*Fifth*, an order requiring the Department to provide the Court with a status report detailing steps taken to comply with this Court's order, including copies of all instructions, guidelines, or other information sent to Title IV servicers.

*Sixth,* award Plaintiff reasonable fees, expenses, costs, and disbursements, including attorneys' fees associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. § 2412.

*Seventh*, award such other and further relief as the nature of the case may require or as may be determined proper by this Court.


Respectfully Submitted,

/s/ Alexander S. Elson
Alexander S. Elson (D.C. Bar No. 1602459)
NATIONAL STUDENT LEGAL DEFENSE
NETWORK
1015 15th Street NW, Suite 600
Washington, DC 20005
Telephone: 202-734-7496
E-mail: alex@nsldn.org


*Attorneys for Plaintiff*

Dated: August 23, 2019